**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------X

BRUCE HALLETT,                                                    Case No.


               Plaintiff,

                                    **COMPLAINT**
      vs.

                                  **Jury Trial Demanded**

STUART DEAN CO., INC., ADRIENE BAILEY,
individually, THOMAS BROWN, individually,
MARGARET CULLEN, individually, SCOTT DAY,
individually, CHRIS DEGAN, individually,
CATHLEEN DEGAN-NIKAS, individually,
SCOTT HALSTEAD, individually, TIMOTHY SHEA,
individually, and KRISTEN SCHORP, individually,


               Defendants.

-------------------------------------------------------------------------X


     Plaintiff Bruce Hallett ("Hallett"), by and through his undersigned attorneys, for his Complaint against Defendants Stuart Dean Co., Inc. ("Stuart Dean" or the "Company") and its Board of Directors (collectively, "Defendants"), alleges as follows:

**INTRODUCTION**

     1.     This dispute arises from Defendant Stuart Dean's breaches of an Employment Agreement with Plaintiff Hallett, as well as other wrongful acts maliciously engaged in by the Company and its Board during the course and scope of Hallett's employment and subsequent termination.

     2.     As set forth below, on or about March 12, 2018, Hallett was hired by Stuart Dean as President and CEO to, among other things, find and generate the interest of an investor.

     3.     Hallett's Employment Agreement provided that his compensation would consist of a base salary, annual performance bonuses, benefits as well as a Long Term Incentive Plan (LTIP).

4.      Throughout his employment with Stuart Dean, Hallett provided the services for which he was contracted, including exploring the sale of the Company to outside investors. On or about March 11, 2020, the Board received an Indication of Interest (IOI) letter, placing a $37M to 47M valuation on the Company.

5.      Notwithstanding his success and other achievements, the Company abruptly terminated Hallett on March 8, 2020; at first giving no reason, then claiming his termination was due to "unapproved and prohibited negotiations with a potential business partner;" to then maintaining that the Company was nonetheless willing to construe his termination *without cause*.

6.      The wavering of reasons offered by the Company for Hallett's termination shows the pretextual nature of his ouster. At least two Board members were personally informed by Hallett that informal discussions were ongoing with a specific, unnamed party. The entire Board was aware that management had been approached by outside parties exploring a potential purchase.  If the discussions were truly prohibited, then the Board members were required to inform Hallett of such in writing pursuant to the Employment Agreement. They did not.

7.      The Board and the Company fabricated a record of "willful misconduct" to justify terminating Hallett for cause in order to facilitate the sale of the Company and escape from its obligations to pay the bonus and other compensation to which he is entitled under the Employment Agreement.

8.      Despite having an obligation to do so, the Board failed to enter into a viable LTIP during Hallett's two years as CEO, showcasing their bad faith. The failure to deliver the promised LTIP deprived Hallett of millions of dollars in compensation.

9.      Accordingly, Hallett brings this action against Stuart Dean to recover compensation rightfully owed to him as a result of the foregoing breaches and violations, including, but not limited to, severance, benefits and unpaid incentive compensation owed to Hallett in an amount to be proven at trial, together with statutory and liquidated damages in an equal amount and attorneys' fees pursuant to New York Labor Law, as well as damages in an amount to be determined at trial resulting from Stuart Dean's malicious and willful defamation of Hallett's reputation.

BN 40609792v1

10.     Hallett also seeks an award of punitive damages to deter and punish Stuart Dean for its brazen abuse of and disregard for contractual rights, employer statutory obligations, and the fundamental right of every employee in New York to work hard, get paid as agreed, and then if necessary, move on in the workplace free from defamation.

## THE PARTIES

11.     Plaintiff Bruce Hallett is a citizen and resident of the State of Vermont.

12.     Defendant Stuart Dean Co., Inc. is a New York corporation with its principal place of business at 450 Seventh Avenue, 38th Floor, New York, New York 10123.

13.     Defendant Timothy Shea is and was at all times the Chairman of Stuart Dean's Board of Directors. At all relevant times, Chairman Shea exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, Shea resides in the State of New Jersey.

14.     Defendant Scott Halstead is and was at all times the Chairman of Stuart Dean's Compensation Committee, and a member of the Board of Directors. At all relevant times, Halstead exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, Halstead resides in the State of California.

15.     Defendant Adriene Bailey is and was at all times a member of Stuart Dean's Board of Directors. At all relevant times, Bailey exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, Bailey resides in the State of North Carolina.

16.     Defendant Thomas Brown is and was at all times a member of Stuart Dean's Board of Directors. At all relevant times, Brown exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and

BN 40609792v1

determining the rate and method of payment. Upon information and belief, Brown resides in the State of New York.

17.     Defendant Margaret (Peggy) Cullen is and was at all times a member of Stuart Dean's Board of Directors. At all relevant times, Cullen exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, Cullen resides in the State of New York.

18.     Defendant Scott Day is and was at all times a member of Stuart Dean's Board of Directors. At all relevant times, Day exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, Brown resides in the State of Georgia.

19.     Defendant Chris Degan is and was at all times a member of Stuart Dean's Board of Directors. At all relevant times, Degan exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, Degan resides in the State of Texas.

20.     Defendant Cathleen Degan-Nikas is and was at all times a member of Stuart Dean's Board of Directors. At all relevant times, Degan-Nikas exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, Degan-Nikas resides in Greece.

21.     Defendant Kristen Schorp is and was at all times a member of Stuart Dean's Board of Directors. At all relevant times, Schorp exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, the State of Louisiana.

## JURIDICTION AND VENUE

BN 40609792v1

22.     Jurisdiction is proper under federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.00.

23.     Venue is proper in the United States District Court for the Southern District of New York under 28 U.S.C. § 1391(b)-(c), because Stuart Dean's principal place of business is located within this district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

### I.     Hallett's Employment With Stuart Dean

24.     As set forth above, Hallett commenced his employment with Stuart Dean, as President and CEO, in or about March 2018.

25.     Prior to his employment with Stuart Dean, Hallett's professional experience included an impressive career with Time-Warner, where he was president of Time Magazine from 1995 to 2002, and then Sports Illustrated from 2002 to 2004. During Hallett's tenure, TIME was twice named as America's "Hottest Magazine." It had not been on the list since 1984, when it was seventh. Hallett also served as managing director of Time, Inc. Magazines Pty., Ltd. He has also served as CEO of Murdoch Books, based in Sydney, Australia, was president of MyPublisher, an Internet-based photo book publisher based in New York, and served as publisher at Playbill magazine. He has also served as a consultant to a variety of companies, including Institutional Investor, News Corp and Veria.

26.     As a result of this impressive background, Hallett was asked to join Stuart Dean's Board of Directors in 2011, indicating that his marketing and sales background would add a new dimension to the Board's skill set.

27.     After serving seven years on the Company's Board, Hallett was then approached to become the next President and CEO of Stuart Dean with all of its attendant duties and responsibilities, including the possibility of the sale of the company.

28.     In conversations prior to his appointment as CEO, then Board Chairman Michael Degan affirmed to Hallett that the shareholders were eager to sell the Company if a satisfactory

BN 40609792v1

price was met. At the time, outside experts had valued the Company at somewhere between $12M and $18M. Hallett indicated that he was willing to commit to a three-year term as Stuart Dean's CEO, but the Chairman specifically asked that he not to make that a hard stop, as he wanted to be assured that in the event of a sale, Hallett would be available for a transition period.

29.     On or about March 12, 2018, Hallett signed an Employment Agreement with Stuart Dean. A true and correct copy of the Employment Agreement is attached hereto as <u>Exhibit A</u>.

30.     Hallett at all times performed his duties for Stuart Dean fully, diligently and successfully.

31.     Within the first few months of his employment, Hallett began conversations with one of the Company's most important competitors in the Southeast—Mid-America Metals—in an effort to address the Company's chronic losses in its Miami, Atlanta, and Charlotte offices. Notably, during the final negotiations with Mid-America Metals in the fourth quarter of 2019, the Board, Board Chairman Tim Shea, and Board Member Adriene Bailey, were insistent that nothing in the final agreement preclude a sale of Stuart Dean to a third party.  "No poison pill" was the phrase repeated over and again.

32.     Hallett also focused his efforts on increasing accountability across the organization, sharpening attention on costs, labor, and direct margins; and built a new strategy for their national account group.

33.     Based on these actions, the Company saw significant improvements reflected in the 2019 results.

34.     The improvements also made the Company more attractive to investors. In the fall of 2019, Thomas Lawless, Stuart Dean's National Director of Business Development, informed Hallett that he had been approached by Jay Leyden, President and CEO of Pritchard Industries, Inc., regarding a possible acquisition of the Company. Hallett, along with Tom Lawless and Colin Turcotte, Stuart Dean's COO, met with Leyden and Pritchard's head of operations for New York, shortly thereafter, during which Leyden reiterated his willingness to explore a potential purchase. But no formal commitments were made at that time.

35.     In the days that followed, Hallett informed Board Chairman Tim Shea of Pritchard's approach. He did not name the prospective buyer because it was premature to do so, and confidentiality in the early stages of any sale is customary.  Its absence can deter progress. Chairman Shea, for his part, did not raise any objection to keeping the prospective buyer anonymous. In fact, he encouraged Hallett to continue his discussions with Pritchard, albeit on an informal basis.

36.     Hallett and his management team continued informal discussions with Pritchard throughout the fourth quarter of 2019 and into the first months of 2020. Hallett suggested to Leyden that he believed Stuart Dean may be purchased for "one-time revenue" – or for a price slightly above $60M (approximately three times Gross Margin). Leyden did not dismiss the price, but indicated he would need more information in order to validate the price.

37.     As conversations with Pritchard continued, Board member Chris Degan reported that the results of a recent shareholder survey showed that a significant number of shareholders were eager to sell the Company sooner rather than later. Outside the survey results, Degan also indicated that he had heard from a number of older shareholders who wanted the liquidity of a sale now. That finding was also consistent with conversations Hallett had had with several shareholders toward the end of 2019, as well as Stuart Dean's former CEO, Jim Degan.

38.     The momentum towards an offer from Pritchard continued after the first of the year. The Board authorized Chris Degan to undertake a second shareholder survey in January 2020 to affirm that many of the shareholders were eager to sell sooner rather than later and to gain insight into the price which the shareholders would consider acceptable. In replying to the survey, there was support for a prompt sale and none of the shareholders replying to the survey suggested that the Company should wait for an offer in excess of $40M.

39.     Pritchard subsequently provided an IOI letter in or about March 11, 2020, putting a $37M to 47M change of control valuation on the Company.

## II.  Hallett's Promised Compensation

40.     Pursuant to the Employment Agreement, the Company agreed that Hallett would receive an annual Base Salary of $425,000 and an Annual Bonus with a target payout of $175,000, or 40% of Base Salary, whichever is greater, based upon the achievement of annual targets under a weighted plan comprising three components, i.e., profit, growth, and Board Specified Special objectives, subject to the terms and conditions of the Bonus Plan to be reviewed and approved annually by the Board. The 2018 Bonus Plan attached to the Agreement provided that: "[t]he annual incentive will be calculated based on the following criteria and consist of three (3) components: Profitability, Operating Revenue Growth & Board Directive Strategic Goals. Abnormal non-recurring income or expense items are to be removed from the calculation." (Ex. A, §§ 2(3), (4).)

41.     The Employment Agreement also provided that Hallett was eligible to participate in the Company's Long Term Incentive Plan (the "LTIP"), the terms of which would be mutually agreed upon by the parties. (Ex. A, § 2(7).)

42.     He was also entitled to receive the following benefits: (i) Company paid health and dental insurance; (ii) Company's 401(k) Retirement Plan; (iii) a $5,000 net bonus; and (iv) other benefits as may be provided by the Company and for which Mr. Hallett was eligible. (Ex. A, § 2(8).)

43.     Notwithstanding the Company's clear contractual obligation to do so, the Board failed to create a viable LTIP during his two years as CEO. Many assurances were given during Compensation Committee reports to the Board that a long term incentive plan was imminent, but none was forthcoming. In 2018, the Board proposed a plan "in lieu of an LTIP" that provided compensation above and beyond salary and bonus based on 2019 revenue increases.

44.     A review of the Board meeting minutes from 2017 through 2019 reflect the repeated assertions by Defendants that an LTIP was on its way. Even as late as August 2019, the Board's meeting minutes reflect (as amended): "Target date for Board DRAFT [of the LTIP] is on or before January 17, 2020 with March 6, 2020 as target date for Board approval."

BN 40609792v1

45.     As an independent Board member, Hallett had served on the Compensation Committee and actively participated in the creation of the LTIP for then CEO—Mark Parrish. The plan, designed with the assistance of PayGovernance, offered multi-million dollar payouts to the CEO if the value of Stuart Dean increased significantly during the period between 2013 and 2018. Payouts of the plan vested immediately in the event of a change of control at the Company. Early in 2019, Hallett was assured by Tim Shea that he could expect to be contacted by PayGovenance regarding the plan. No call ever came. A copy of the Parrish Plan was also circulated to the Board in mid-2019 for its consideration as a model for Hallett's LTIP.

46.     Having failed to present on its promise to deliver an LTIP, Hallett emailed the Company's Compensation Committee regarding the omission on or about February 24, 2020. The Committee Chairman Scott Halstead responded two days later, on or about February 26, 2020, indicating that Hallett would not be receiving any LTIP, as he was no longer eligible given there was only a year left of his employment term. Hallett immediately responded to the Committee (copying Board Chairman Tim Shea), disputing their conclusion and stating that such failure constituted a material breach of his Employment Agreement; citing, among other reasons, the possibility of a sale in the ensuing 12 months. He received no response.

47.     Because of Hallett's efforts as CEO, an investor wanted to buy into the Company and provided an IOI letter, putting a $37M to 47M change of control valuation on the Company. Stuart Dean's failure to deliver the promised LTIP thereby deprived Hallett of millions of dollars in compensation.

### III.  Hallett's Termination

48.     On March 7, 2020, Chairman Shea informed Hallett in a telephone call that the Board "was going in a different direction" and that he would be terminated by "unanimous vote" of the Board the following day. Shea declined to provide a specific reason, simply stating "we're not getting into that." Nonetheless, Shea assured Hallett that he would receive six month's severance pay in accordance with the terms with his Employment Agreement, regardless of whether he resigned or was terminated. Shea also indicated that he would recommend to the Board

that Hallett receive a performance bonus for 2019, assuming he agreed to sign a general release. Before the end of the day, Hallett informed Chairman Shea that he was unwilling to resign.

49.     On March 8, 2020, the Company sent a formal letter regarding Hallett's termination, giving no indication or reason for "*Cause*," stating only that: "If the Company determines that there is no cause for your termination pursuant to Section 10 of the Employment Agreement, you will be provided with a Separation Agreement and General Release thereto…" A true and correct copy of the March 8 Letter is attached as Exhibit B.

50.     The Company then sent another termination letter on March 13, 2020, for the first time indicating that Hallett was being terminated for *Cause*, stating: "[t]he Company believes that you have engaged in acts of willful misconduct in connection with your duties as CEO as it relates to unapproved and prohibited negotiations with a potential business partner thereby warranting termination under Section 10(a)(ii)(D)." The letter further provides that the Company "[will] [is willing] to construe your termination as without cause under Section 10, Subsection C [if you sign an Agreement and General Release]," but "any participation or coverage to which you may have been entitled under the Company's benefit plans or other benefits outlined in your Employment Agreement expire on March 9, 2020, except your health insurance will expire on March 8…" A true and correct copy of the March 13 letter is attached hereto as Exhibit C.

51.     On March 18, 2020, Mr. Hallett sent an email to Chairman Shea, recounting the conversation they had had on March 7, 2020.  The email stated that: "I asked you whether or not it might be wise to postpone the Board decision on my termination as there was a likelihood that an IOI might be forthcoming from the same firm that had expressed interest in acquiring Stuart Dean in the fall of 2019—which you had been informed of by me at the outset of discussions and of which you had been regularly informed. You said "no". Paraphrasing, you said things would unfold in due course and I would have no role whatsoever in the organization following my termination or resignation…" Hallett received no response from Shea.

52.     Section 10 of the Employment Agreement sets forth the terms governing termination. If terminated without *Cause*, Hallett was entitled to receive: (i) his Base Salary

through the date of termination; (ii) reimbursement for any unpaid business expenses; (iii) all benefits to which he was entitled under the Company's benefit plans; (iv) an additional six months of his Base Salary; and (v) up to twelve month's reimbursement for health insurance premiums.

53.     If terminated for *Cause*, Hallett would only receive: (i) his Base Salary through the date of termination; (ii) reimbursement for any unpaid business expenses; and (iii) all benefits to which he would be entitled under the Company's benefit plans. (Ex. A, § 10(a)(iii).)

54.     The Employment Agreement defines *Cause* as: (a) continued failure substantially to perform his duties for a period of 10 business days following written notice by the Company, (b) dishonesty of his duties, (c) an act or acts constituting a felony or misdemeanor involving moral turpitude, (d) willful misfeasance or willful misconduct in connection with his duties or any act or omission which is materially injurious to the financial condition or business reputation of the Company, or (e) improper use of confidential information. (Ex. A, § 10(a)(ii).)

55.     Whether or not terminated for *Cause*, Hallett was still entitled to full payment of all monies which Stuart Dean agreed to pay him under the Employment Agreement, including without limitation, the annual bonus and incentive compensation under the LTIP.

56.     Upon information and belief, the LTIP payments to which Hallett is entitled amount to millions of dollars in unpaid compensation.

57.     In addition, pursuant to Stuart Dean's established policies and practices concerning the payment of severance, Hallett is entitled to severance pay and other benefits which have not been paid to him.

58.     Stuart Dean has expressly refused and failed to make any of the above described payments to him notwithstanding Hallett's demands therefor.

59.     Prior to commencing suit, a demand letter was sent to the Company in an attempt to resolve these matters informally. The Company has continued to refuse to pay the monies owed and has continued to act in bad faith forcing Hallett to commence this legal action.

## COUNT 1

### (Breach of Contract - Wrongful Termination Against the Company)

60.     Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

61.     The Employment Agreement entered into by Hallett and Stuart Dean is a valid and enforceable contract under New York law.

62.     Hallett duly performed the terms and conditions of the Employment Agreement, and the Company accepted and benefited from the services performed by Hallett.

63.     As set forth above, Hallett was appointed as CEO of the Company based on his background of experience.  Included in his responsibilities both generally and specifically was a duty to entertain the interest of potential investors.

64.     After learning of Pritchard's initial approach, Hallett informed two members of the Board that informal discussions were ongoing with an investor regarding a potential acquisition.

65.     If such discussions were prohibited, pursuant to Section 10(a)(ii) of the Employment Agreement, the Board was required to provide Hallett with 10-days written notice of his alleged failure to substantially perform under the contract.

66.     No such notice was provided.

67.     The wavering reasons offered by the Company and the Board for Hallett's termination from no reason, to alleged willful misconduct for engaging in purportedly unapproved negotiations, to a Company shift towards a willingness to construe his termination without cause, shows the pretextual nature of his ouster.

68.     Defendant has breached its contractual obligations under the Employment Agreement by terminating Hallett under the pretext of his alleged misconduct, and by failing to pay him the compensation owed as a result of his termination, including without limitation, his severance pay and benefits.

69.     As a direct and proximate result of Defendant's breach, Hallett has been damaged in the amount to be determined at trial.

## COUNT 2

### (Breach of Contract - Failure to Pay Bonus Compensation Against the Company)

70.     Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

71.     As set forth above, Hallett entered into a valid and enforceable Employment Agreement with Stuart Dean.

72.     Pursuant to Section 2(4) of the Employment Agreement, Stuart Dean agreed to and was obligated to pay the annual bonus due Hallett for 2019.

73.     Pursuant to Section 2(7) of the Employment Agreement, Stuart Dean agreed to and was obligated to provide an LTIP, from which Hallett could earn additional incentive compensation.

74.     As described above, after Hallett accepted and commenced his employment with Stuart Dean, the Company failed to create a viable LTIP for Hallett. Many assurances were given during Compensation Committee reports to the Board that a plan was imminent, but none was forthcoming. When Hallett attempted to address the issue, the Company refused to provide any proposal, claiming he was no longer eligible given that there was only a year left of his employment. There is no such limitation in the Agreement.

75.     The failure of the Company to provide an LTIP constitutes a breach of contract.

76.     In addition, Hallett met or exceeded all targets set forth in the Employment Agreement, entitling him to receive the nondiscretionary annual bonus provided therein.

77.     By failing to pay him the 2019 nondiscretionary annual bonus, Defendant breached its contractual obligations to Hallett under the Employment Agreement.

78.     As a direct and proximate result of Defendant's breach, Hallett has been damaged in the amount to be determined at trial.

BN 40609792v1

## COUNT 3

**(Failure to Pay Wages in Violation of New York Labor Law Against All Defendants)**

79.     Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

80.     Pursuant to the New York Labor Law ("NYLL"), Defendants acted as Hallett's employer within the meaning of NYLL § 193.

81.     Pursuant to the Employment Agreement, Defendants promised to pay Hallett compensation in the form of an annual bonus and LTIP. Such compensation was non-discretionary and fully vested at the time of Hallett's termination.

82.     Despite multiple demands, Defendants knowingly and willfully withheld Hallett's earned compensation upon termination when Defendant failed to pay Hallett his annual bonus and other incentive compensation owed under the LTIP.

83.     Defendant's refusal to pay Hallett the aforementioned incentive compensation constitutes an unlawful deduction in violation of NYLL § 193.

84.     Defendant's withholding of the foregoing compensation due and owing to Hallett was willful and done in bad faith. Accordingly, Hallett is entitled to liquidated damages equal to 100% of the unpaid wages due and owing to him pursuant to NYLL § 198(1-a).

85.     Hallett is also entitled to recover all reasonable attorneys' fees incurred in connection with his claim, along with prejudgment interest pursuant to NYLL § 198(1-a).

86.     Due to the control and involvement of the individual Board members, they are individually liable for wage violations under the NYLL.

87.     As a direct and proximate result of Defendant's breaches of the NYLL, Hallett has been damaged in an amount to be determined at trial, and is entitled to an award of liquidated damages, attorneys' fees, and prejudgment interest owed in connection with these violations.

BN 40609792v1

**COUNT 4**

**(Retaliation Under NYLL Against All Defendants)**

88.     Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

89.     As set forth above, despite its obligation under the Employment Agreement, the Company failed to provide Hallett with a viable LTIP during his two years as CEO.  Multiple assurances were made during Compensation Committee reports to the Board that a plan was imminent, none was forthcoming.

90.     On or about February 24, 2020, Hallett emailed the Compensation Committee regarding the omission. The Committee replied on or about February 26, 2020, declaring that he was no longer entitled to an LTIP because there was only a year left of his employment term. Hallett immediately wrote back (copying Board Chairman Tim Shea), disputing their conclusion and stating that such failure constituted a material breach of his Employment Agreement. He received no response.

91.     Not long thereafter, on or about March 8, 2020, Hallett was terminated.

92.     As set forth above, by failing to provide an LTIP, Defendants deprived Hallett of millions of dollars in nondiscretionary incentive compensation to which he was entitled, in violation of NYLL § 193.

93.     Under NYLL § 215(1)(a), "No employer…shall discharge…or retaliate against any employee (i) because such employee has made a complaint to his or her employer…that the employer has engaged in conduct that the employee…believes violates" the NYLL.

94.     Hallett engaged in a protected activity when he complained to the Committee about the Company's failure to provide an LTIP, in violation of the NYLL.

95.     Shortly after receiving his complaint, Defendants terminated Hallett under the guise of pretextual misconduct.

96.     By retaliating against Hallett for his complaint regarding their violations of the NYLL, Defendants violated NYLL§ 215.

BN 40609792v1

97.     At all relevant times, the individual Defendants and/or other wrongdoers acted as agents of the Company, and the Company is vicariously liable for their actions.

98.     As a result of the retaliatory animus, Hallett has suffered damages, including but not limited to, reputational harm, and is entitled to equitable and monetary relief including but not limited to compensatory and other damages, reasonable attorneys' fees and costs, punitive damages, and other appropriate relief.

99.     Notice of this claim has been served upon the Attorney General pursuant to NYLL § 215(2).

## COUNT 5

### (Promissory Estoppel Against All Defendants)

100.    Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

101.    As described above, Defendants induced Hallett to sign on and stay as CEO of the Company with the promise that he would be eligible to participate in the Company's LTIP pursuant to his Employment Agreement, entitling him to receive millions of dollars in additional compensation upon a sale of the Company.

102.    After Hallett accepted and commenced his employment with Stuart Dean, the Company failed to enter into any conversations with him regarding the creation of a viable LTIP. Many assurances were given during Compensation Committee reports to the Board that a plan was imminent, but none was forthcoming. Even as late as August 2019, the Board's meeting minutes reflect (as amended): "Target date for Board DRAFT is on or before January 17, 2020 with March 6, 2020 as target date for Board approval." A copy of the Parrish plan that Hallett had helped create for the former CEO was also circulated to the Board in mid-2019 for consideration as a model for Hallett's LTIP.

103.    When there was still no LTIP by the end of February 2020, Hallett contacted the Compensation Committee, at which time they informed him there would be no proposal given there only a year left of his employment. He was subsequently terminated shortly thereafter.

104.    Hallett reasonably and justifiably relied on Defendants' promises regarding an LTIP that would provide millions of dollars in additional non-discretionary compensation.

105.    At all relevant times, the individual Defendants and/or other wrongdoers acted as agents of the Company, and the Company is vicariously liable for their actions.

106.    As a direct and proximate result of Defendants' breach, Hallett has suffered damages in an amount to be determined at trial.

## COUNT 6

**(Breach of Implied Covenant of Good Faith and Fair Dealing Against All Defendants)**

107.    Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

108.    The Employment Agreement between Hallett and Stuart Dean contained implied covenants of good faith and fair dealing.

109.    These implied covenants obligated the Defendants to refrain from doing any act that would deprive Hallett of the benefits of the Employment Agreement, or that would impede Hallett from performing any or all of the conditions of the Employment Agreement that he agreed to perform.

110.    Defendants' misconduct described herein breached the implied covenant of good faith and fair dealing in connection with the LTIP and other monies owed under the Employment Agreement.

111.    In particular, Defendants induced Hallett to sign on and stay as CEO of the Company with the promise that he would be provided an LTIP entitling him to additional compensation, then interfered with his right to receive such compensation by failing to deliver an LTIP, fabricating pretextual misconduct, and prematurely terminating him solely to avoid paying the compensation that he would otherwise be owed in connection with a sale of the Company.

112.    At all relevant times, the individual Defendants and/or other wrongdoers acted as agents of the Company, and the Company is vicariously liable for their actions.

113.    As a direct and proximate result of Defendants' breach, Hallett has been damaged.

## COUNT 7

### (Fraudulent Inducement Against All Defendants)

114.    Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

115.    As described above, Defendants made false representations and misrepresentations of material fact regarding Hallett's participation in an LTIP that would entitle him to receive additional compensation in the event of a sale of the Company pursuant to his Employment Agreement.

116.    The representations made by the Company and Board regarding the LTIP were untrue and known to be untrue by Defendants, but were made for purposes of inducing Hallett's reliance thereon.

117.    Hallett, unaware of the falsity of the representations, reasonably and justifiably relied on the representations to his detriment.

118.    At all relevant times, the individual Defendants and/or other wrongdoers acted as agents of the Company, and the Company is vicariously liable for their actions.

119.    As a direct and proximate result of Defendants' fraudulent misrepresentations, Hallett has been damaged.

## COUNT 8

### (Negligent Misrepresentation Against All Defendants)

120.    Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

121.    As described above, Defendants were careless in imparting false promises and misrepresentations regarding an LTIP to Hallett, which they should have known were incorrect, and which they knew Hallett was expected to rely on in considering whether he would agree to join as Stuart Dean's CEO.

122.    Defendants had a duty to provide Hallett with complete and accurate information.

123.    Defendants knew that the promises they made regarding the LTIP were desired by Hallett for purposes of determining whether he would agree to accept their proposed terms for his employment as CEO.

124.    At all relevant times, the individual Defendants and/or other wrongdoers acted as agents of the Company, and the Company is vicariously liable for their actions.

125.    As a direct and proximate result of Defendants' negligent misrepresentations, Hallett has been damaged.

## COUNT 9

### (Defamation Against All Defendants)

126.    Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

127.    Defendants published false and defamatory statements in its March 13, 2020 termination letter regarding his alleged "willful misconduct," which did or had the tendency to expose Hallett to disgrace.

128.    The defamatory statements in the letter are of and concerning Hallett and reasonably understood to be about Hallett.

129.    Defendants published the defamatory statements in the letter knowing they are false or with reckless disregard for the truth of the statements.

130.    The false and defamatory statements in the letter constitute defamation *per se* because they tend to injure Hallett in his trade, business or profession.

131.    The defamatory statements in the letter have directly and proximately caused Hallett to suffer significant damages, including damage to his reputation, humiliation, embarrassment, shame, and emotional distress. The damages are ongoing in nature and will continue to be suffered in the future.

132.    Defendants' conduct was committed knowingly, intentionally, willfully, wantonly, and maliciously, with the intent to harm Hallett, or in blatant disregard of the substantial likelihood of causing him harm, thereby entitling Hallett to an award of punitive damages.

19

BN 40609792v1

133.    At all relevant times, the individual Defendants and/or other wrongdoers acted as agents of the Company, and the Company is vicariously liable for their actions.

134.    As a direct and proximate result of Defendants' conduct, Hallett is entitled to compensatory, special, and punitive damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Bruce Hallett respectfully prays for the following:

a.  On Count 1, a judgment in an amount to be determined at trial;

b.  On Count 2, a judgment in an amount to be determined at trial;

c.  On Count 3, a judgment in an amount to be determined at trial, along with reasonable attorneys' fees, liquidated damages, prejudgment interest, and costs;

d.  On Count 4, a judgment in an amount to be determined at trial, along with reasonable attorneys' fees, liquidated damages, prejudgment interest, and costs;

e.  On Count 5, a judgment in an amount to be determined at trial;

f.  On Count 6, a judgment in an amount to be determined at trial;

g.  On Count 7, a judgment in an amount to be determined at trial, along with punitive damages;

h.  On Count 8, a judgment in an amount to be determined at trial;

i.  On Count 9, a judgment in an amount to be determined at trial, along with special and punitive damages; and

j.  On all Counts, Judgment for Plaintiff against Defendants for reasonable attorneys' fees, costs, prejudgment and post-judgment interest, and such further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial on all triable issues.

BN 40609792v1

DATED:  May 18, 2020                    BUCHALTER
                                        A Professional Corporation



                                  By:   */s/ Ashley L. Milnes*
                                        Tracy A. Warren, Esq.
                                        (*Pro Hac Vice Forthcoming*)
                                        Ashley L. Milnes, Esq.
                                        (*Pro Hac Vice Forthcoming*)
                                        Buchalter, A Professional Corporation
                                        655 W. Broadway, Suite 1625
                                        San Diego, California 92101
                                        Phone: (619) 219-5360
                                        twarren@buchalter.com
                                        amilnes@buchalter.com

                                        *Attorneys for Plaintiff Bruce Hallett*



DATED:  May 18, 2020                    CALCAGNI & KANEFSKY LLP



                                  By:   _____
                                        Lauren M. Paxton, Esq.
                                        Calcagni & Kanefsky, LLP
                                        85 Broad Street, Suite 17031
                                        New York, New York 10004
                                        Phone: 862-233-8130
                                        Fax: 862-902-5458
                                        LPaxton@ck-litigation.com

                                        *Local Counsel for Plaintiff Bruce Hallett*

21